# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

**META Y. SMITH**

**VERSUS**

**MICHAEL J. ASTRUE,**
**COMMISSIONER OF THE SOCIAL**
**SECURITY ADMINISTRATION**

**CIVIL ACTION**

**NO. 10-380-FJP-CN**

## NOTICE

Please take notice that the attached Magistrate Judge's Report has been filed with the Clerk of the United States District Court.

In accordance with 28 U.S.C. § 636(b)(1), you have fourteen (14) days after being served with the attached Report to file written objections to the proposed findings of fact, conclusions of law and recommendations therein. Failure to file written objections to the proposed findings, conclusions, and recommendations within 14 days after being served will bar you, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions of the Magistrate Judge which have been accepted by the District Court.

Signed in chambers in Baton Rouge, Louisiana, September 29, 2011.

**MAGISTRATE JUDGE CHRISTINE NOLAND**

UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

| META Y. SMITH | CIVIL ACTION |
|---|---|
| VERSUS | NO. 10-380-FJP-CN |
| MICHAEL J. ASTRUE, COMMISSIONER OF THE SOCIAL SECURITY ADMINISTRATION | |

## MAGISTRATE JUDGE'S REPORT

Plaintiff, Meta Y. Smith, seeks judicial review of a final decision of the Commissioner of Social Security denying her applications for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) under Titles II and XVI of the Social Security Act. In making that final decision, the Administrative Law Judge (ALJ) reached the fourth step of the five-step sequential disability analysis set forth in 20 C.F.R. § 416.920(b)-(f),[1] and found that plaintiff had the residual functional capacity (RFC) to perform her past relevant work as an adult day care provider. (Tr. 140.)

## FACTS AND PROCEDURAL HISTORY

On November 26, 2007, plaintiff filed applications for disability benefits and supplemental security insurance benefits alleging that she became disabled on October 31, 2007, due to AIDS, Hepatitis B and C, and peripheral neuropathy. (Tr. 134, 185-186.) Both applications were denied at the initial level on February 13, 2008, and after a timely request for hearing, the Administrative Law Judge (ALJ) conducted an administrative hearing on

---

[1] Harrell v. Bowen, 862 F.2d 471, 475 (5th Cir. 1988).

June 1, 2009. (Tr. 166-169, 245-273.) Plaintiff, who was represented by counsel as well as a vocational expert (VE), appeared and testified at the hearing. On September 25, 2009, the ALJ issued an adverse decision denying disability and supplemental security insurance benefits.

At the time of the hearing, plaintiff was 51 years of age with a high school education and past relevant work as a cashier, cook, and an adult day care provider. (Tr. 140, 249, 268-271.) In his decision, the ALJ found that plaintiff met the insured status requirement through September 30, 2010, and while she did work after her alleged onset date of October 31, 2007, the ALJ did not consider the work activity to be gainful, and therefore found plaintiff had not engaged in substantial gainful activity since October 31, 2007. (Tr. 136, Finding No.2.) The ALJ also found that plaintiff had severe impairments of HIV positive, Hepatitis B and C, depression, and hypertension, but that these impairments, either alone or in combination, did not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 137, Findings No. 3 and 4.) The ALJ also determined that plaintiff's subjective complaints were not credible to the extent alleged. (Tr. 138.) The ALJ then determined that plaintiff retained the residual functional capacity (RFC) to perform light work[2] with the exception of grasping objects on a repetitive bases. Further, due to her emotional problems, the ALJ determined that plaintiff could not perform complex work and

---

[2] Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. *See,* 20 C.F.R. §§ 404.1567(b), 416.967(b).

would be limited to one-two-three step instructions with limited interaction with the general public. (Tr. 138, Finding No. 5.) Considering this RFC, the ALJ posed a hypothetical to the VE inquiring as to plaintiff's ability to perform her past relevant work. Given the VE's testimony and the record evidence as a whole, the ALJ found that plaintiff could perform her past relevant work as an adult day care provider since this work did not require the performance of work-related activities precluded by the plaintiff's RFC, and therefore was not disabled. (Tr. 140, Findings No. 6 and 7.) Plaintiff requested a review of the ALJ's decision by the Appeals Council and submitted additional medical evidence for the Council's consideration. (Tr. 11-130.) The Appeals Council found that the additional evidence did not provide a basis for changing the ALJ's decision and denied plaintiff's request for review on March 31, 2010. (Tr. 3-5). The ALJ's decision, therefore, became the final decision of the Commissioner, which decision is now before this Court.

## **ANALYSIS**

Judicial review of a final decision of the ALJ denying disability insurance benefits and supplemental security income benefits is limited to two inquiries: (1) whether there is substantial evidence in the record as a whole to support the ALJ's findings, and (2) whether the ALJ applied the proper legal standards.[3] In applying the "substantial evidence" standard, the Court must carefully scrutinize the record to determine if, in fact, substantial evidence supporting the decision exists, but the Court may not reweigh the evidence in the record, nor try the issues de novo, nor substitute its judgment for the ALJ's even if the evidence

---

[3] Boyd v. Apfel, 239 F.3d 698 (5th Cir. 2001).

4

preponderates against the ALJ's decision.[4] Substantial evidence means more than a scintilla, but less than a preponderance, and is such relevant evidence as a reasonable mind might accept to support a conclusion.[5] A finding of "no substantial evidence" will be made only where there is a conspicuous absence of credible choices or an absence of medical evidence contrary to the claimant's position.[6]

The burden of proof in disability administrative hearings rests predominately on the plaintiff, and toward that end, the plaintiff and the ALJ conduct a five-step analysis.[7] Only if the plaintiff proves that she is no longer able to work in her past relevant work does the burden shift to the Commissioner to establish that the plaintiff nonetheless has the ability to engage in other substantial gainful activity.[8] This case was decided at step four, and the burden of proof rested squarely on plaintiff to prove she could not return to her past relevant work.[9]

Plaintiff, however, argues that the matter should be remanded to the ALJ for consideration of evidence that was submitted to the Appeals Council after the ALJ's decision.

## *MEDICAL EVIDENCE*

---

[4] Id.

[5] Richardson v. Perales 402 U.S. 389, 401 (1971).

[6] Johnson v. Bowen 864 F.2d 340, 343-44 (5th Cir. 1988).

[7] Brown v. Apfel, 192 F.3d 492, 497-498 (5th Cir. 1999).

[8] Rivers v. Schweiker, 684 F.2d 1144, 1155-1156 & n.14 (5th Cir. 1982).

[9] Mays v. Bowen, 837 F.2d 1362, 1364 (5th Cir. 1988)(per curiam).

A.     *Evidence considered by the ALJ.*

On December 26, 2007, Peggy Kaimal, an advanced practice registered nurse at the Huey Long Center, reported on a medical report form that the plaintiff had been treated for several infections including: mycrobacterial infection, syphilis, candidiasis, herpes simplex virus, and herpes zoster. Also checked were boxes for anemia and nephropathy resulting in chronic renal failure. Plaintiff has standing orders for medication for frequent yeast infections and Aciclovir for herpes outbreaks. Ms. Kaimal also noted that plaintiff had also received treatment at the Capital City Health Care Center in Baton Rouge, from 2002-2006, which would be outside of the relevant time period of October 31, 2007 through September 25, 2009. (Tr. 227-229.)[10]

On January 26, 2008, plaintiff underwent a consultative examination by Matthew Erickson, MD at the request of the Social Security Administration. Dr. Erickson reported that plaintiff was well-developed, well-nourished, appropriately dressed, and in no acute distress. On mental examination, Dr. Erickson opined that plaintiff had an intact memory, communicated with no deficits, and had good insight. Plaintiff's gait was normal and she could bend and squat without difficulty, and her fine motor movements and dexterity were adequate but had a decreased ability to grasp objects bilaterally. Based on his examination, Dr. Erickson found that plaintiff would not be able to grip, lift and carry objects due to her decreased grip strength, but she should be able to sit, walk and/or stand for a full workday,

---

[10] Defendant has summarized these medical records in his opposition, however, since this treatment is outside of the relevant time period, the Court will not reiterate the summary of the records, as they are not relevant to this action.

6

hold a conversation, respond appropriately to questions, and carry out and remember instructions. (Tr. 231-233.)

Plaintiff received treatment at the Caring Clinic of Louisiana in Baton Rouge, Louisiana (Caring Clinic) between October 7, 2008 through June 1, 2009. In October 2008, the clinician reported that plaintiff was doing well overall, but her nephropathy was getting worse. (Tr. 243.) It was also noted at this time that plaintiff's mood was good and her energy level was normal. Plaintiff returned to the Caring Clinic on November 7, 2008, complaining of palpitations of the heart, and it was at this time that plaintiff first admitted to missing some dosages of her prescribed medications. The clinician reports that she spent 15 minutes discussing adherence and resistance issues with plaintiff. Relative to plaintiff's HIV, the records indicate that her CD-4 count was 306.[11]

Plaintiff returned to the Caring Clinic on February 27, 2009, complaining of memory loss, calf pain, and difficulty sleeping. Plaintiff reported that she was getting better at taking her medications as prescribed, but was still missing some doses. Plaintiff also stated that she felt her depression was worse and that she voluntarily stopped taking Risperadol due to weight gain. Plaintiff was diagnosed with a mood disorder, and ordered to stop taking her antiretroviral medications and was prescribed Abilify. During a visit in March 23, 2009, it

---

[11] The CD-4 cell count is the measurement of CD-4 or T-helper cells in a sample of blood. Vulnerability to opportunistic infections increases markedly when CD-4 cells are less than 200. The current recommendation is to initiate a regimen consisting of three antiretroviral drugs. The difficulty with a multi-drug regimen is that the patient may not fully comply. When changing a failing regimen, two new drugs (preferably three new drugs) should be started. *See The Merck Manual*, 1132, 1314, 2538 (18th ed. 2006).

was noted that Abilify seemed to be helping plaintiff's mood. (Tr. 239-240.) The progress notes from the Caring Clinic on June 1, 2009 show the following:

> Doing fairly well, mood disorder continues to hamper ability to treat her HIV ....We have not yet got her into mental health. The last adjustment of her meds seem to be helping a little. She has had persistent problems with the following: (1) sleep disturbance, (2) decreased energy almost cripling (sic), (3) difficulty concentrating, (4) anhedonia, (5) feelings of guilt. These issues cause (1) marked difficulty in social functioning; (2) marked difficulty in maintaining concentration; (3) recurrent episodes of decompensation. (Tr. 238.)

B.  *Additional Evidence Submitted to the Appeals Council*

It should be noted that some of the records submitted after the hearing decision were duplicative or outside of the relevant time period.[12]

During a visit to the Huey Long Center on July 9, 2007, it was documented that plaintiff was taking the following medications: Kaletra, Combivir, Lexapro, Valtrex (as needed), Diflucan, Benicort, Wellbutrin, and Risperdal. It was also noted that plaintiff was smoking cigarettes and also using marijuana. On July 27, 2007, plaintiff returned for a blood pressure check up. Progress notes indicate that plaintiff had not taken her blood pressure medication that day and the physician stressed to plaintiff the importance of adhering to her medication regimen. (Tr. 56-58.)

On December 26, 2007 plaintiff returned to see Ms. Kaimal at the Huey Long Center. On this date she complained of headaches, muscle pain, a sore throat, and a low-grade fever. Ms. Kaimal noted that plaintiff had not been taking her antiretroviral medication for two

---

[12] Defendant's Memorandum at p. 8. Relevant time period is October 31, 2007 through the date of the ALJ's decision, September 25, 2009.

8

months because of the side effects, including diarrhea. Plaintiff was order to switch to a new set of antiretroviral medications. (Tr. 71.)

On February 19, 2008, plaintiff returned the Huey Long Center complaining of odd thoughts and sleep difficulties. The psychiatrist diagnosed plaintiff with schizophrenia and prescribed Risperdal. (Tr. 108.)[13] In March 2008, plaintiff complained of depressive symptoms and the psychiatrist diagnosed depressive disorder and prescribed Wellbutrin.[14] On her April 8, 2008 visit, plaintiff reported an improved mood and increased activity and she was ordered to continued the prescribed medications.

On April 22, 2008, plaintiff continues to improve. She stated to the psychiatrist at the Huey Long Center that her ability to communicate had improved, and that taking Risperdal had slowed down her racing thoughts. She also stated that things were "flowing" and that her marriage was the best it had been in 5 years. At this visit the psychiatrist ruled out bipolar disorder and anxiety. (Tr. 115.)

Plaintiff returned to the Huey Long Center on July 22, 2008 and reported that she was having anger issues, but that she had stopped taking Risperdal because she felt it wasn't working. At plaintiff's request, the psychiatrist prescribed Xanax and ordered her to continue taking Risperdal. (Tr. 122.)

Plaintiff argues that the Appeals Council did not adequately consider nor discuss the above summarized additional evidence. First of all, the records submitted dating from July

---

[13] As of July 2007, plaintiff was already prescribed this medication.

[14] As of July 2007, plaintiff was already prescribed this medication.

2001 through August 2006 were outside of the relevant time period (Tr. 33-35, 79-107.) The Fifth Circuit has held that a claimant is not prejudiced by the Appeals Council's failure to specifically address her new medical evidence, where the evidence did not pertain to the relevant time period.[15] Therefore, because this evidence is outside the relevant time period, the Appeals Council properly concluded that these records did not warrant changing the ALJ's decision. (Tr. 3-4.)

As far as the evidence submitted within the relevant time period, i.e. October 2007 through September 2008, the Court agrees with the facts set forth by Defendant, Commissioner, that this new evidence pertains primarily to plaintiff's treatment for depressive symptoms, and did not warrant changing the ALJ's decision. The Defendant Commissioner writes:

> More specifically, Plaintiff had continued to receive treatment from Huey Long Center for depression and schizophrenic symptoms, which consisted solely of anti-depressant medications and monitoring. (Tr. 73-73, 110, 114, 115, 122.) The new evidence indicated that when taking her prescribed medications, plaintiff reported an improved mood, better communication skills and good marital relations. Further plaintiff's HIV appeared to respond to antiretroviral medications, and her CD-4 count had increased to 304 (Tr. 116)[16]

Throughout the medical records, the medications prescribed to plaintiff appear to be working when plaintiff adheres to the prescription regime. The Fifth Circuit has held that conditions that can be remedied or controlled by medication or therapy are not disabling.[17]

---

[15] Newton v. Apfel, 209 F.3d 448, 460 (5th Cir. 2000.) As Defense Counsel points out, the Appeals Council did consider such records as they made them part of the administrative record.

[16] Defendant Commissioner's Memorandum at p. 13.

[17] Johnson v. Bowen, 864 F.2d 340, 348 (5th Cir. 1988).

Therefore, the Court finds that the Appeals Council properly determined that the new evidence would not have changed the Commissioner's decision and thus denied plaintiff's request for review.

## *MEETING A LISTING*

Plaintiff next argues that she meets the following Listings: 12.04, *Affective Disorders;*[18] 14.08-*HIV Infection*;[19] 11.14-*Peripheral Neuropathies*;[20] and 5.00, *Chronic Liver Disease.*[21] In order for plaintiff to prove that she meets or equals a listed impairment, she must prove that all of the specified medical criteria of each particular listing is met.[22]

With regard to Listing 12.04, *Affective Disorders*, the medical evidence simply does not show that plaintiff has persistence in any of the symptoms required by paragraph A of the Listing. The key word here is persistence. No evidence indicates that any of these

---

[18] See, 20 C.F.R. § 404, Subpt. P, App. 1, 12.04A. In order to meet the severity level for this disorder the requirements in both A and B need to be satisfied, or when the requirements of C are satisfied.
 A. Medically documented persistence, either continuous or intermittent, of one of the following: depressive syndrome by at least four of the following, anhedonia, appetite disturbance, sleep disturbance, psychomotor agitation or retardation; decreased energy; feelings of guilt or worthlessness; difficulty concentrating or thinking; thoughts of suicide; and hallucinations, delusions or paranoid thinking.
 B. The impairment must result in two of the following: Marked restriction of activities of daily living; or marked difficulties in maintaining social functioning; or marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of decompensation.

[19] 14.08, HIV Infections: See, 20 C.F.R. § 404, Supt. P, App. 1, 14.00F.

[20] See, 20 C.F.R. § 404, Subpt. P, App. 1, 11:14 *Peripheral neuropathies*. With disorganization of motor function as described in 11.04B, in spite of prescribed treatment.

[21] Hepatitis B and C are not by themselves listed impairments, but that are evaluated under Listing 5.05, which sets forth the following criteria: "hemorrhaging from esophageal, gastric or ectopic varices or from portal hypertensive gastropathy, demonstrated by endoscopy, x-ray, or other appropriate medically acceptable imaging, resulting in hemodymnaic instability as defined in 5.00D5, and requiring hospitalization for transfusion of at least 2 units of blood...."

[22] Sullivan v. Zebley, 493 U.S. 521, 530 (1990); Selders v. Sullivan, 914 F.2d 614, 619 (5th Cir. 1990)(claimant must provide medical findings that support each of the criteria for an equivalent impairment determination.)

symptoms continued for any length of time. Plaintiff relies on the clinician's assessment notes of June 1, 2009, from the Caring Clinic. The assessment stated that Plaintiff had marked difficulty in social functioning, marked difficulty in maintaining concentration, and recurrent episodes of decompensation.[23](Tr. 238.) However, the ALJ discredited this assessment because there was contradictory evidence in the record showing that plaintiff engaged in many daily activities, including spending time with her husband, caring for her four year-old grandson, doing housework, attending church, and visiting her family. (Tr. 257-259.) The record further shows that plaintiff was described as alert and oriented with good communication and an intact memory, not to mention that her condition improves with medication. (Tr. 233 and 139.) Therefore, substantial evidence shows that Listing 12.04 has not been met and plaintiff has failed to meet her burden.

With regard to Listing 14.08, *HIV Infection*, plaintiff's HIV positive status has been documented, however to meet this listing, she must show that she has had one of the 11 conditions identified under subparagraphs to Listing 14.08. The conditions are enumerated as A-K and consist of (A) Bacterial infections, (B) Fungal infections, © Protozoan or helminthic infections, (D) Viral infections, (E) Malignant neoplasms, (F) Conditions of the skin or mucous membranes, (G) HIV encelphalopathy, (H) HIV wasting syndrome, (I) Diarrhea, (J) Any one of the following: Sepsis, meningitis, pneumonia, septic arthritis,

---

[23] Episodes of decompensation or deterioration may be inferred from medial records showing significant alteration in medication or documentation of the need for a more structured psychological support system, such as hospitalization, placement in a halfway house, or a highly structured directing household. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, 12.00C(4).

endocarditis, or sinusitis documented by appropriate imaging; (K) Repeated manifestation of A-J.[24] Plaintiff has not pointed to any evidence in the record indicating that she has suffered any of these conditions and related symptoms as set forth under 14.08. Plaintiff's HIV has been virtually asymptomatic, and she has received very little treatment for the condition.[25] (Tr. 140, 255.) Further, plaintiff's CD-4 count has not been documented to fall below 200, which would cause vulnerability to opportunistic infections.[26] Because plaintiff has not carried her burden of proving that she meets all criteria of this listing, the Court finds there is sufficient evidence to support the ALJ's finding that plaintiff does not meet the HIV Infection Listing.

Plaintiff also argues that she meets Listing 11.14, *Peripheral Neuropathies*. This listing requires disorganization of motor function as described in 11.04B, in spite of prescribed treatment. Listing 11.04B provides that the claimant must exhibit significant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dexterous movements, or gait and station. The listing then refers to Part 11.00C. Part 11.00C of the listing provides that such neurological impairments may be manifested through paresis or paralysis, tremors or involuntary movements, ataxia, and

---

[24] 20 C.F.R. Pt. 404, Subpt. P, App. 1, 14.08 A-K.

[25] Fraga v. Bowen, 810 F.2d 1296, 1301 (5th Cir. 1987)(an ALJ may properly consider infrequent treatment in evaluating the severity of alleged impairments.)

[26] See footnote 9.

sensory disturbances, which occur singly or in various combinations.[27] As shown in the above medical summary, Dr. Erickson conducted a neurological examination in January of 2008. (Tr. 231-235.) While Dr. Erickson noted that all cranial nerves, sensory function, reflexes, and coordination were all intact, and that plaintiff had no atrophy in her upper extremities, and adequate fine motor movements and dexterity, he also noted that plaintiff had decreased grip strength and sensation bilaterally. Even with this decreased grip, the only limitation Dr. Erickson placed on plaintiff was that she probably could not use cutlery in a safe manner and could not perform her former occupation in the food service industry. He did opine, however, that even with this limitation, plaintiff should be able to sit, walk, and/or stand for a full workday, hold a conversation, respond appropriately to questions, carry out and remember instruction, but would be unable to grip, lift and carry objects secondary to her decreased grip strength. Further, plaintiff testified that she could make use of her hands including tending to her personal grooming, caring for her 4-year old grandchild and doing housework. (Tr. 196, 257-260.) This evidence does not show a significant and persistent disorganization of motor function as set forth in the listing, and plaintiff has not pointed to any evidence that does. Therefore, the Court finds the ALJ's decision was proper, and that there is substantial evidence in the record to support the determination that plaintiff does not meet this listing.

---

[27] See, 20 C.F.R. § 404, Subpt. P, App. 1, 11.14 *Peripheral neuropathies*. With disorganization of motor function as described in 11.04B, in spite of prescribed treatment.

Finally, plaintiff argues that her Hepatitis B and C meet the Chronic Liver Disease Listing (5.05). Plaintiff testified that she had not had any treatment for hepatitis, and that she declined her doctor's recommendation of interferon therapy because of the alleged side effects. (Tr. 140, 252.) Plaintiff's failure to seek treatment supports the ALJ's determination that plaintiff's Hepatitis B and C infections were not presumptively disabling.[28] The Court agrees, that she does not meet this listing.

As defendant Commissioner points out, the purpose of the listings is to streamline the decision process by identifying those claimants whose medical impairments are so severe that it is likely they would be found disabled regardless of their vocational background. The Court agrees with defendant that this is clearly not the case here and substantial evidence supports the ALJ's step-three determination that plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P. Appendix 1. (Tr. 137, and Defendant's Memorandum at p. 17.)

## *MEDICAL OPINION EVIDENCE*

Plaintiff next argues that the ALJ erred in rejecting her treating physician's opinion. Plaintiff points to the records from the Caring Clinic dated October 2008 to June 1, 2009, and a letter dated June 18, 2009 from a case manager as corroborative evidence to support her disability. However, the ALJ discussed the June 1, 2009 progress note from Caring Clinic and declined to give it controlling weight because it was conclusory and inconsistent with

---

[28] See, Fraga, 810 F.2d at 1301.

15

the other medical evidence of record. This progress note, as stated above, indicates that plaintiff was having persistent sleep disturbances, decreased energy, difficulty concentrating, anhedonia, and feelings of guilt which caused marked difficulties in social function, maintaining concentration, and recurrent episodes of decompensation. First, there is no record evidence to support the fact that plaintiff has had recurrent episodes of decompensation. Second, the Clinic's own treatment notes indicate that when plaintiff began treatment, her mood was good and her energy level was normal. Also, in March 2009, it was noted that Abilify was helping plaintiff with her mood and there was no mention of persistent sleep, social or concentration problems. (Tr. 139, 243, and 239.) It was not until the day of plaintiff's disability hearing that the physician from Caring Clinic opined that plaintiff suffered marked limitations with social functioning and concentration and episodes of decompensation, which the Court notes follows the language from the listing pretty much verbatim. An ALJ may reject a treating physician's opinion if he finds, with support in the record, that the physician is not credible and is "leaning over backwards to support the application for disability benefits."[29] Dr. Erickson's assessment, which was discussed above, and plaintiff's own testimony regarding her daily activities, further contradicts Caring Clinic's assessment. Therefore, plaintiff's argument is without merit, and the ALJ was proper in his finding with respect to rejecting this opinion.

Plaintiff also argues that proper consideration was not given to her former mental health case manager, Marsha Thomas. (Tr. 236.) As defendant commissioner points out,

---

[29] Scott v. Heckler, 770 F.2d 482, 485 (5th Cir. 1985.)

there is no indication that Ms. Thomas is a physician or other acceptable medical source under the Commissioner's regulations.[30] Therefore, Ms. Thomas would be considered an "other source" and not able to offer a medical opinion that would be entitled to controlling weight. The regulations state that a source must provide information to allow the ALJ to make a determination of the claimant's RFC, and the Fifth Circuit has held that a recording of symptoms is not entitled to great weight when the documentation of symptoms is "by history" rather than by direct observations.[31] Ms. Thomas' letter, dated three weeks after the hearing, fails to address what plaintiff can or cannot do, and seems to be based entirely on plaintiff's subjective complaints. Further, the letter clearly states that it was written to "help with her disability case." The Fifth Circuit has held that an ALJ acts within his discretion by rejecting letters from lay witnesses written in support of the claimant's disability case.[32] Therefore, the Court finds that the ALJ was proper in rejecting the "opinion" of Ms. Thomas.

## *RFC DETERMINATION*

Since plaintiff failed in her burden of proving that her impairments meet or equal a listed impairment, the ALJ proceeded to step four to determine if she could perform any of her past relevant work. Here, the ALJ found that plaintiff was not disabled because she retained the RFC to perform her past relevant work as an adult day care provider as actually

---

[30] 20 C.F.R. § 404.1513(a)(d); Social Security Ruling (SSR) 06-03p, 2006 WL 2329939 at *2 (noting the distinction between acceptable medical sources and other sources). SSR 06-03p explains that only acceptable medical sources can offer a medical opinion or be a treating source.

[31] See, 20 C.F.R. §404.1513(d)(e); and Greenspan v. Shalala, 38 F.3d 232, 237, 238 (5th Cir. 1994).

[32] Harrell v. Bowen 862 F. 2d 471, 482 (5th Cir. 1988).

and generally performed. (Tr. 140.) In making this determination, the ALJ posed a hypothetical question to the VE at the hearing. The VE testified that considering plaintiff's RFC of light work with some physical and mental restrictions assessed by the ALJ, plaintiff could perform her past relevant work as an adult day care provider. In an attempt to prove that she is unable to perform her past relevant work, plaintiff argues that the ALJ did not allow her to testify about the duties she performed as an adult day care provider for the mentally impaired. However, plaintiff, when questioned by the VE, described her duties as supervising arts and crafts, assisting clients with learning to feed themselves, and coaching clients on their social skills. (Tr. 270.) The VE further questioned plaintiff if she took the clients out in a social setting, and she responded that she did not. The ALJ also gave plaintiff's attorney the opportunity to question plaintiff but she chose not to do so. (Tr. 272-273.) Thus, plaintiff's contention that she was not allowed to testify about her duties as an adult day care provider is without merit.

Accordingly, the Court finds that there is substantial evidence in the record to support the ALJ's decision that plaintiff is not disabled and that the ALJ followed the proper legal standards in making that determinations set forth in the decision.

## RECOMMENDATION

Therefore, it is recommended that the ALJ's decision be affirmed and that the plaintiff's appeal be dismissed, with prejudice.

Signed in chambers in Baton Rouge, Louisiana, September 29, 2011.

**MAGISTRATE JUDGE CHRISTINE NOLAND**